**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| **JODI WEBER, JMW INDIANA LLC, and MWL INDIANA LLC,**<br><br>Plaintiffs,<br>v.<br><br>**DL FRANCHISING, LLC,**<br><br>Defendant. | **Civil Action No. ____________** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Jodi Weber, JMW Indiana LLC, and MWL Indiana LLC (hereafter, collectively, "Plaintiffs"), for their Complaint against Defendant DL Franchising, LLC d/b/a Deka Lash (hereafter "Deka Lash" or "Defendant"), allege as follows:

**PRELIMINARY STATEMENT**

1. This action arises from a franchisor's sustained failure to deliver the core benefits of a franchise system it sold through material misrepresentations, while continuing to extract fees and royalties from a franchisee it was failing to support.

2. Plaintiffs invested over $2,000,000 in reliance on Deka Lash's pre-sale representations regarding franchise profitability, territorial protection, and operational support. Those representations proved false.

3. Throughout the franchise relationship, Deka Lash failed to provide the onboarding, digital marketing, and territorial protections its agreements required; permitted encroachment into Plaintiffs' protected territory; charged fees for services not rendered; and made unauthorized withdrawals from Plaintiffs' accounts. Its misconduct extended through a botched technology transition in 2025 and into 2026, including demands made against Plaintiffs after the closure of both franchise locations.

4. As a direct result, both franchise locations have closed and Plaintiffs have suffered losses exceeding $2,000,000.

5. Plaintiffs bring this action under Indiana franchise law, the common law of fraud and contract, and equitable principles to recover those losses.

6. To the extent Defendant invokes the Franchise Agreement's one-year contractual limitations clause, the provision is void under the Indiana Deceptive Franchise Practices Act, which expressly prohibits franchisors from limiting litigation arising from a franchise relationship. Defendant's continuing misconduct independently tolls any applicable limitations period.

## JURISDICTION, VENUE AND CHOICE OF LAW

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. Plaintiffs JMW Indiana LLC and MWL Indiana LLC are Indiana limited liability companies whose sole member, Jodi Weber, is a citizen of Florida. Weber relocated to Florida in or around late summer 2024—selling her Indiana home on September 6, 2024, and relocating to a Florida condominium—as a direct consequence of the financial devastation caused by Defendant's conduct alleged herein. In the depths of her financial crisis, Weber also listed her Florida condominium for sale in an effort to liquidate every available personal asset to sustain the franchise operations Defendant was failing to support. Defendant DL Franchising, LLC d/b/a Deka Lash is a Utah limited liability company with its principal place of business in McMurray, Pennsylvania, and is therefore a citizen of Utah and Pennsylvania. Complete diversity exists between the parties, as Plaintiffs are citizens of Florida and Indiana, and Defendant is a citizen of Utah and Pennsylvania.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in Indiana, including the operation of Plaintiffs' franchise locations in Carmel and Noblesville, Indiana, the territorial encroachment, the digital marketing failures, and the unauthorized account withdrawals affecting Plaintiffs' Indiana-based operations.

**10.** Notwithstanding the Franchise Agreement's forum selection clause designating Pennsylvania as the exclusive venue for disputes, that clause is unenforceable as applied to Plaintiffs' claims. The Indiana Deceptive Franchise Practices Act expressly prohibits franchisors from limiting litigation arising out of a franchise agreement, rendering the forum selection clause void as to those claims. *Burns Ind. Code Ann.* § 23-2-2.7-1 (making it unlawful to "[l]imit[ ] litigation brought for breach of the agreement in any manner whatsoever"). Moreover, Indiana has the most significant relationship to this dispute under applicable conflicts of law principles: both franchise locations are in Indiana, all franchise operations occurred in Indiana, and Plaintiffs are Florida and Indiana residents operating Indiana entities. Enforcement of the Pennsylvania forum selection clause would deprive Plaintiffs of non-waivable statutory rights under Indiana law.

## PARTIES

11. Plaintiff Jodi Weber ("Weber") is an individual currently domiciled in the State of Florida. Weber relocated to Florida in or around late summer 2024 as a direct consequence of the financial devastation caused by Defendant's conduct alleged herein. Weber was forced to sell her Indiana home—which closed on September 6, 2024—and to relocate permanently to a condominium she owns in Florida after exhausting her personal savings in an effort to sustain both franchisee locations in the face of Defendant's sustained failures. In the depths of her financial crisis, Weber also listed her Florida condominium for sale in an effort to liquidate every available personal asset

to sustain the franchise operations Defendant was failing to support. Prior to this involuntary relocation, Weber was a full-time resident of Indiana, where both franchise locations were situated. Weber considers Florida her current home, though she hopes to return to Indiana in the future. Weber is the sole member and owner of JMW Indiana LLC and MWL Indiana LLC, and is personally liable as guarantor under both Franchise Agreements. Weber brings this action individually and as the person who made the investment decisions at issue in reliance on Defendant's misrepresentations.

12. Plaintiff JMW Indiana LLC ("JMW") is an Indiana limited liability company whose sole member is Jodi Weber, a citizen of Florida. JMW operated a Deka Lash franchise location in Noblesville, Indiana pursuant to a Franchise Agreement dated June 29, 2021. The Noblesville location closed on June 15, 2024 as a direct result of Defendant's conduct alleged herein.

13. Plaintiff MWL Indiana LLC ("MWL") is an Indiana limited liability company whose sole member is Jodi Weber, a citizen of Florida. MWL operated a Deka Lash franchise location in Carmel, Indiana pursuant to a Franchise Agreement dated June 29, 2021. The Carmel location closed on March 15, 2026 as a direct result of Defendant's conduct alleged herein.

14. Defendant DL Franchising, LLC d/b/a Deka Lash is a Utah limited liability company with its principal place of business located at 3527 Washington Road, McMurray, Pennsylvania 15317. Deka Lash franchises eyelash extension studios throughout the United States, including in the State of Indiana, and at all relevant times acted as the franchisor under the Franchise Agreements at issue in this action.

## FACTUAL ALLEGATIONS

### A. Pre-Sale Representations

15. Prior to executing the first Franchise Agreement on June 29, 2021, Plaintiff Weber participated in due diligence calls organized by Deka Lash for prospective franchisees. During

those calls, multiple Deka Lash representatives made direct representations to Weber regarding the profitability timeline she could expect as a Deka Lash franchisee.

16. Specifically, Karli Blair ("Blair"), a Deka Lash representative, stated to Weber during a Zoom call that "it takes nine months to be profitable." Joe Gordon ("Gordon"), a Deka Lash representative, made the same representation on a group call with prospective franchisees. Gordon's call was a recorded session in which he answered questions from live prospective franchisees, and multiple such recorded calls were made available for prospective franchisees to review. Additionally, Shallyn Rold ("Rold"), Director of Franchise Operations, made the same nine-month profitability representation on a group call with serious prospective investors. Troy McCullen ("McCullen"), a Franchise Success Team member, also stated the nine-month profitability timeline to Weber on multiple occasions. These representations were made numerous times by multiple Deka Lash representatives. When the profitability question was posed again at a later point, Blair answered "eighteen months." These representations were made in direct response to questions from prospective franchisees, including Weber, regarding the timeline for achieving profitability as a Deka Lash franchisee.

17. These representations were material. Weber was considering an investment requiring hundreds of thousands of dollars in initial fees, leasehold improvements, equipment, and operating capital. The timeline for achieving profitability was directly relevant to her assessment of whether and when her investment would be recovered.

18. Deka Lash provided Weber with its Franchise Disclosure Document ("FDD") on May 26, 2021, approximately 34 days before signing. Item 19 of the FDD disclosed only average gross revenues for a limited number of franchise outlets during fiscal year 2020—a year materially affected by the COVID-19 pandemic—and disclosed no net profit data. The FDD contained no

representation that any franchisee had achieved profitability within nine or eighteen months of opening, and contained no data from which such a conclusion could reasonably be drawn. In addition, Deka Lash provided Weber with a pro forma template containing built-in calculations and formulas, to which Weber was required only to input minimal figures into such as her rent, total operating hours, and employee hourly rate. This pro forma, provided by Defendant as part of the pre-sale process, was itself a financial representation tool that reinforced the profitability timeline representations made by Defendant's representatives.

19. The oral representations made by Blair, Gordon, Rold, McCullen, and other Deka Lash representatives were not authorized by the FDD. To the contrary, the FDD expressly prohibited Deka Lash personnel from making financial performance representations beyond those contained in Item 19, and instructed prospective franchisees to report any such outside representations. Notwithstanding those prohibitions, Blair, Gordon, Rold, McCullen, and other Deka Lash representatives made the profitability representations described above to Weber and other prospective franchisees during organized due diligence calls—calls that Deka Lash itself arranged and conducted as part of its franchise sales process.

20. Deka Lash knew, or recklessly disregarded, that these representations were false or misleading at the time they were made. Deka Lash possessed internal financial data regarding the actual performance of its franchisees, including net profitability timelines, that it did not disclose in the FDD or otherwise provide to Weber. The gross revenue figures Deka Lash did disclose in Item 19, standing alone, were insufficient to support any representation that franchisees would achieve profitability within nine to eighteen months of opening, particularly after accounting for the royalty obligations, brand development fees, technology fees, lease costs, payroll, and other operating expenses that franchisees were required to bear.

21. Weber reasonably relied on the representations made by Blair, Gordon, Rold, McCullen, and other Deka Lash representatives in deciding to execute the Franchise Agreement on June 29, 2021, and the subsequent Franchise Agreement on October 4, 2021. Had Weber known that Deka Lash's franchisees were not achieving profitability within nine to eighteen months as she had been informed—and that Deka Lash had no reasonable basis for representing that they would—she would not have entered into either Franchise Agreement or made the investments those agreements required.

**B. Franchise Relationship**

22. On June 29, 2021, Plaintiff JMW Indiana LLC entered into a franchise agreement with Defendant covering three territories: the Noblesville, Indiana territory; the Carmel, Indiana territory (which would later be operated under MWL Indiana LLC upon its formation); and a third territory located in Florida. The third territory in Florida never opened. The Franchise Agreement executed on June 29, 2021 lists only JMW Indiana LLC. Upon formation of MWL Indiana LLC for the Carmel location, per the advice of Weber's accountant, Weber communicated this entity change to Deka Lash and the ACH authorization for the Carmel location was executed under MWL Indiana LLC on October 27, 2022. A true and correct copy of this Franchise Agreement is attached hereto as Exhibit A.

23. On October 4, 2021, Plaintiff entered into a second franchise agreement with Defendant for a fourth territory, located in Florida. This territory was never opened. A true and correct copy of this Franchise Agreement is attached hereto as Exhibit B.

24. Plaintiff Jodi Weber executed personal guaranties in connection with both Franchise Agreements, personally obligating herself for the performance of all obligations thereunder.

25. Under the terms of both Franchise Agreements, Defendant undertook specific and material obligations to Plaintiffs, including without limitation:

a. Providing a defined and protected exclusive territory within which Defendant would not establish or license any competing Deka Lash outlet;

b. Providing pre-opening onboarding and operational support, including point-of-sale ("POS") system setup, phone and merchant services configuration, staff training, and access to Defendant's Operations Manual;

c. Providing ongoing operational support throughout the franchise relationship;

d. Maintaining and controlling digital marketing for Plaintiffs' locations, including accurate listings on Google Maps, Apple Maps, and Defendant's own studio directory;

e. Administering the Brand Development Fund to which Plaintiffs were required to contribute, for the benefit of Plaintiffs' and all franchisees' locations;

f. Providing required technology systems and supporting Plaintiffs through any required system transitions; and

g. Complying with all fee, royalty, and payment provisions set forth in the Franchise Agreements, including applicable royalty abatement provisions.

26. In consideration of these obligations, Plaintiffs paid Defendant a total of $105,900 under the Area Development Agreement dated June 29, 2021, covering three territories (Territory 1: $52,900; Territory 2: $37,000; Territory 3: $16,000), and $41,900 under the Franchise Agreement dated October 4, 2021 for the fourth Florida territory, together with an Operations Onboarding and Location Assistance Fee of $5,450 (a one-time fee paid upon execution of the first FDD) and a Non-Refundable Training Fee of $3,500 per location.

27. Plaintiffs further obligated themselves to pay ongoing royalties of six percent (6%) of gross studio sales, a Brand Development Fee of one percent (1%) of gross studio sales, a technology fee of $399 per month per location, and various other fees as set forth in the Franchise Agreements.

28. Plaintiffs opened the Noblesville location on May 31, 2022, and the Carmel location on October 10, 2022.

29. As set forth in detail below, Defendant failed to perform its material obligations under both Franchise Agreements from the outset of the relationship and continuing through the closure of both franchise locations and into 2026. Despite these failures, Defendant continued to collect royalties, fees, and other payments from Plaintiffs throughout the operative period.

30. The Noblesville location ultimately closed on June 15, 2024 as a direct and proximate result of Defendant's failures alleged herein. The Carmel location closed on March 15, 2026, also as a result of Defendant's sustained failures. At the time of filing, the Carmel studio landlord has requested mediation regarding payment of remaining lease obligations and back rent due.

**C. Territorial Encroachment and Market Interference**

31. Both Franchise Agreements designated a "Protected Area" for each of Plaintiffs' studios. The protection afforded by the Protected Area was limited. Subject to the reservations of rights set forth in Sections 3.14 and 3.15 of the Franchise Agreements, Defendant agreed that it would not license another franchisee to open or operate a physically located Deka Lash studio within the designated Protected Area. Defendant expressly reserved, however, the right to sell products and services into the Protected Area through the internet and other alternative channels of distribution without compensating Plaintiffs, and the right to acquire a competing system with one or more units already located within the Protected Area, among other reserved rights. Pursuant to the Franchise Agreement dated June 29, 2021, Plaintiffs' Protected Area in Indiana encompassed zip

codes 46033, 46037, 46038, 46060, and 46062 in the Indianapolis metropolitan area, as well as Florida zip codes 34102, 34103, 34105, 34108, 34109, and 34116 in the Naples area. Pursuant to the Franchise Agreement dated October 4, 2021, Plaintiffs' Protected Area encompassed Florida zip codes 34134, 34135, 34110, and 33928.

32. Defendant breached these territorial protections—and demonstrated its disregard for them—before Plaintiffs' first location had even opened.

33. In or around September 2021, Weber communicated to Deka Lash's corporate broker, Josh Evans ("Evans"), her intention to expand into Cool Creek Commons in Carmel, Indiana as the site for her second franchise location. Weber had repeatedly conveyed this intention to Evans in calls and emails, making clear that Cool Creek Commons was her intended expansion site and that she expected Defendant to protect her interest in that location consistent with her territorial rights under the first Franchise Agreement.

34. Notwithstanding Weber's clearly expressed intentions and her established territorial rights, Evans permitted a competing franchisee to negotiate for and execute a Letter of Intent ("LOI") for the Cool Creek Commons site. That LOI was dated September 30, 2021. Weber was not informed of this development. She discovered the encroachment only during a call on November 19, 2021—nearly two months after the competing LOI had already been executed.

35. Upon Weber's objection, Defendant halted the competing franchisee's pursuit of the Cool Creek Commons site. However, Evans thereafter ceased substantive communications with Weber. Critically, Evans' withdrawal occurred while Weber was still in the process of finalizing lease negotiations for her first Noblesville location. Weber was ultimately forced to finalize the Noblesville lease without Evans' support, and later had her local broker reach out independently to the broker of Cool Creek Commons to express interest for future development. Weber

subsequently secured the Cool Creek Commons site through her own efforts, and opened her Carmel studio there in October 2022—a process that was subsequently delayed and complicated by Defendant's initial breach and subsequent withdrawal from the process.

36. Defendant's conduct with respect to Cool Creek Commons was not an isolated incident. Even after Weber secured the Carmel location, Defendant permitted the opening of a competing Deka Lash studio—the Market District location—approximately five miles from Plaintiffs' Carmel studio in January 2023. The proximity of the Market District studio to Plaintiffs' Carmel location created direct competitive overlap, customer confusion, and market diversion at the precise moment when the Carmel studio was in its critical early operating period.

37. The opening of the Market District location five miles from Plaintiffs' Carmel studio caused immediate and measurable harm. Customers searching for Plaintiffs' Carmel location were directed to the Market District studio, compounding the digital visibility failures described below. Revenue and membership growth that would otherwise have accrued to Plaintiffs was diverted to the competing location. These harms were exacerbated by the fact that, as also described below, Defendant's own digital marketing systems were simultaneously displaying the Market District studio's information in response to searches for Plaintiffs' Carmel location.

38. Weber notified Defendant of the encroachment and competitive harm caused by the Market District opening. Defendant failed to remedy or adequately respond to these concerns.

39. Defendant's conduct—permitting a competing franchisee to execute an LOI for Weber's intended expansion site, withdrawing from communications when confronted, and subsequently permitting the opening of a competing studio five miles from Plaintiffs' Carmel location—constituted a breach of Defendant's territorial protection obligations under the Franchise Agreements and a violation of the Indiana Deceptive Franchise Practices Act, *Burns Ind. Code*

*Ann.* § 23-2-2.7-2(4), which, where no exclusive territory is designated, prohibits a franchisor from competing unfairly with the franchisee within a reasonable area.

**D. Digital Visibility and Marketing Failures**

40. From the opening of the Carmel studio in October 2022 through approximately March 2024—a period of nearly eighteen months—Defendant failed to establish and maintain Plaintiffs' Carmel location in Defendant's own digital infrastructure, online search platforms, and mapping services. This failure was not a temporary technical glitch. It was a sustained, documented, and repeatedly reported breakdown that rendered Plaintiffs' studio effectively invisible to the public throughout the most critical period of its operation, while a nearby competing Deka Lash studio appeared overtly prominent in the same digital channels.

<u>Invisibility in Digital Channels</u>

41. From and after the Carmel studio's opening in October 2022, Deka Lash Carmel was absent from Defendant's own studio locator, Google Maps, Apple Maps, and general search engine results. Customers searching for Deka Lash Carmel by its exact name received no results directing them to Plaintiffs' location. Customers searching for Deka Lash Indiana were directed to every Deka Lash studio in the state except Plaintiffs' Carmel studio. No corporate link for Plaintiffs' studio appeared in search results. Apple Maps did not list Plaintiffs' studio at all. This invisibility persisted from October 2022 through at least March 2024, when some digital platforms finally began reflecting Plaintiffs' location accurately—only after the competing Market District studio had closed.

42. Throughout this period, Weber repeatedly reported the digital invisibility to Defendant and its representatives. Defendant's staff acknowledged the existence of these problems, provided written assurances that corrective action was being taken, and described various troubleshooting

measures being tested—including renaming conventions and other technical fixes. These assurances were not fulfilled. The problems persisted for nearly eighteen months notwithstanding Weber's repeated complaints and Defendant's repeated representations that they were being addressed.

The Market District Confusion

43. While Plaintiffs' Carmel studio was invisible in digital channels, the competing Deka Lash Market District studio—operated by a different franchisee approximately five miles from Plaintiffs' location—appeared prominently in online searches, including searches for "Deka Lash Carmel." The Market District studio incorporated the word "Carmel" in its name—operating as "Deka Lash Market District Carmel" or "Deka Lash Market District (Carmel)"—which Defendant permitted despite the obvious and foreseeable confusion this would cause with Plaintiffs' studio, which was actually located in Carmel. The Market District studio appeared in online search results before it had even opened, while Plaintiffs' already-operating studio remained invisible.

44. As a direct result, customers searching for Plaintiffs' Carmel studio were routinely directed to the Market District location instead. Clients arriving at one location believed they were at the other. The confusion was compounded by an independent contractor who had originally been hired by Weber to provide social media services for her studio but was subsequently directed by Defendant's corporate staff to also provide services to the Market District studio—resulting in nearly indistinguishable branding between the two competing locations and further muddling client perception.

45. Defendant permitted this confusion to persist throughout the period both studios were operating. The digital visibility issues were not fully resolved until after the Market District studio

closed in late February 2024, and Apple Maps visibility for Plaintiffs' Carmel studio lagged until March 2024.

Misdirected and Failed Advertising

46. The digital failures extended to Defendant's sponsored advertising program. Defendant required Plaintiffs to contribute to the Brand Development Fund—ostensibly to fund robust marketing for all franchisees—and separately required Plaintiffs to pay $399 per month in technology fees. During the approximately eighteen-month period of digital invisibility, Plaintiffs paid approximately $7,581 in technology fees alone, in addition to their ongoing Brand Development Fund contributions.

47. Notwithstanding these payments, sponsored digital advertisements run by Defendant's third-party advertising vendors—including Deka Digital and subsequently Eulerity—on behalf of Plaintiffs' Carmel studio repeatedly included the Market District studio's address and imagery, directed prospective customers to the Market District location rather than Plaintiffs' studio, or failed to run at all. These advertising failures were acknowledged by Defendant's representatives and reoccurred throughout 2023. Refunds for erroneous advertising charges were delayed or incomplete.

48. In October 2023, Defendant further disadvantaged Plaintiffs by restricting Plaintiffs' digital marketing radius to five miles, while other Deka Lash franchisees were permitted to target areas of fifteen to twenty-five miles. This restriction was imposed without adequate justification and placed Plaintiffs at a competitive disadvantage relative to other franchisees in the Deka Lash system. The restriction was eventually rescinded following Weber's objection, but its competitive impact on the Carmel studio persisted.

Harm Caused

49. The combined effect of these failures—eighteen months of digital invisibility, sustained customer confusion with the Market District studio, misdirected advertising, and an unjustified marketing radius restriction—caused severe and quantifiable harm to Plaintiffs. Weber was forced to invest significant personal funds in independent marketing and digital campaigns solely to make her studio discoverable to potential clients, an expense she would not have incurred had Defendant fulfilled its digital marketing obligations. Despite these efforts, Plaintiffs were unable to overcome the obstacle created by Defendant's failures during the studio's critical early operating period.

50. Weber attributes the closure of the Noblesville location in June 2024, and the ultimate closure of the Carmel location in March 2026, at least in part to the sustained period of digital invisibility and market confusion Defendant's failures created. By the time the digital issues were resolved in early 2024, Plaintiffs had exhausted their financial resources attempting to sustain both locations without the corporate digital support they had contracted and paid for. The closure of both locations followed directly from the financial devastation caused by Defendant's sustained failures during this critical period.

**E. Operational and Onboarding Failures**

51. Defendant's obligations under the Franchise Agreements included providing comprehensive pre-opening operational support—including timely setup of the point-of-sale system, studio phone, credit card merchant services, digital and social media accounts, online booking capability, a "coming soon" web presence, and initial staff training—all of which Defendant's own pre-opening checklists and franchise documentation required to be completed weeks in advance of opening. Defendant failed to fulfill these obligations for both of Plaintiffs' locations, with the failures most acute and fully documented with respect to the Carmel studio.

<u>POS System and Payment Processing</u>

52. Defendant was responsible for establishing Plaintiffs' point-of-sale account on the MyTime platform prior to opening. The POS system was required to be operational weeks before the studio opened in order to enable staff scheduling, client appointment entry, inventory management, and payment processing. For the Carmel studio, Defendant did not complete the MyTime setup until days before the October 10, 2022 opening—and the account was not fully verified and operational even on opening day itself.

53. Weber contacted Defendant's corporate staff on October 11, 2022—the day after opening—to report that the corporate website still did not enable online bookings for her studio, because Defendant had failed to complete the MyTime setup and payment verification in a timely manner. As a result, Plaintiffs' Carmel studio opened without functioning online booking capability, without the ability to enter staff schedules into the system, and without the ability to process client appointments and transactions through the required corporate platform.

<u>Studio Phone and Credit Card Processing Equipment</u>

54. The studio phone system and credit card processing terminals—both required to be operational prior to opening under Defendant's own franchise documentation—were not delivered or activated until days before, and in some instances after, the Carmel studio's October 10, 2022 opening. These delays prevented Plaintiffs from conducting pre-opening client communications and payment processing through the required systems and further compounded the operational disruption caused by the POS setup failure.

<u>Digital and Social Media Setup</u>

55. From August 2022 through the October 2022 opening of the Carmel studio, Weber made repeated requests to Defendant's corporate staff—including a representative identified as Carly—for setup of the studio's social media profiles, Google My Business page, online booking

integration through the corporate website, and a "coming soon" digital presence. These requests were met with delays and ineffective responses. None of these digital assets were live on the Carmel studio's opening day.

56. The absence of a "coming soon" listing and functioning digital presence in the weeks before opening deprived Plaintiffs of the pre-opening marketing period that is standard in the franchise industry and that Defendant's own onboarding process was designed to provide.

57. Weber was forced to divert time and resources from other opening preparations to pursue these setup items, including leaving the studio during the training period to manage administrative tasks that should have been completed by Defendant weeks earlier.

Initial Lash Training

58. Defendant's Franchise Agreements obligated Defendant to provide an initial training program—a three-day in-person course—for Plaintiffs and their staff prior to opening, as required by Sections 5.1 and 6.1 of the applicable Franchise Agreement. Defendant's own standards required Initial Lash Training dates to be confirmed four weeks prior to opening.

59. Weber requested that Initial Lash Training be scheduled for October 5-7, 2022. That schedule was confirmed. On October 1, 2022—only four days before the confirmed scheduled training was to begin—Defendant's corporate trainer, identified as Greta, notified Weber that the training dates were being changed to October 10-12, 2022. This last-minute change forced Weber to reorganize her newly hired employees' start dates, disrupted the onboarding schedule she had built around the original training dates, and effectively pushed the studio's opening to the date training began.

60. The training itself was deficient. The corporate trainer assigned to Plaintiffs' studio was an individual Weber had not previously met and who refused to provide the hands-on in-person lash

technique instruction that was standard in the industry. The practical consequence was that Plaintiffs' newly hired lash artists did not receive the complete technical instruction for which Plaintiffs had paid a $3,500 Non-Refundable Training Fee.

61. Further, because the POS system was also not operational on the first day of training—October 10, 2022—lash models brought in for the training session could not be entered into the system as appointments, transactions could not be processed, and the training was further disrupted by the cascading effect of Defendant's setup failures.

<u>The Onboarding Fee and Corporate Broker Failure</u>

62. Plaintiffs paid Defendant a non-refundable Operations Onboarding and Location Assistance Fee of $5,450, which was a one-time fee paid upon the execution of the first FDD, in exchange for dedicated support for site selection, buildout, onboarding, and digital launch activities. These services were represented as fully earned by Defendant upon payment and as essential to supporting a successful franchise launch.

63. Contrary to these representations, Evans became nonresponsive at a critical juncture in the pre-opening process for the Carmel studio. Evans' withdrawal occurred while Weber was still finalizing lease negotiations on her first Noblesville location, leaving her without corporate support during a pivotal period. The withdrawal of Evans's support left Plaintiffs without the coordinated corporate onboarding assistance the $5,450 fee was intended to provide, and forced Weber to manage critical pre-opening tasks without the corporate infrastructure she had contracted and paid for.

<u>Cascading Harm</u>

64. The cumulative effect of these onboarding failures was severe. Plaintiffs' Carmel studio launched on October 10, 2022 without functioning online booking, without digital visibility,

without a verified payment processing system, and with staff whose training had been disrupted and truncated at the last minute. These failures were not isolated inconveniences—they deprived Plaintiffs of the critical pre-opening marketing period, prevented early client acquisition, and undermined staff confidence and competence at the most important moment of the studio's commercial life. The operational fallout from this period cascaded through the studio's early months and materially contributed to the financial difficulties that ultimately led to the closure of the Noblesville location and the ongoing unprofitability, and ultimate closure, of the Carmel location.

65. Most acute setup issues were resolved piecemeal in the two weeks following the October 2022 opening, but the competitive and reputational damage caused by launching without the required systems and support was not recoverable within that timeframe.

**F. Improper Fees and Unauthorized Withdrawals**

66. Throughout the franchise relationship, Defendant engaged in a pattern of improper fee collection, unauthorized financial withdrawals, and unilateral changes to payment practices—extracting funds from Plaintiffs without contractual authority, for services not provided, and in direct contravention of the written terms of the Franchise Agreements and the ACH authorizations Plaintiffs had executed.

<u>Royalty Abatement Not Honored</u>

67. The applicable Franchise Agreement and FDD expressly provided that franchisees who opened a studio ahead of the required development schedule would receive a royalty abatement—a suspension of royalty payment obligations—for a period equivalent to the time by which the opening preceded the contractual deadline. Item 6, Note 3 of the FDD specifically stated that no royalties would be collected until the date royalties were scheduled to begin under the Franchise

Agreement, and that for each month a studio opened ahead of schedule, an equivalent period of abatement would apply.

68. Plaintiff MWL Indiana LLC opened the Carmel studio on October 10, 2022—more than eight months ahead of the June 29, 2023 development deadline established under the Franchise Agreement. This early opening unambiguously triggered the royalty abatement provision. Notwithstanding this entitlement, Defendant charged and collected royalties from Plaintiffs for the Carmel studio from October 2022 through June 2023, a period during which no royalties were contractually owed. Weber repeatedly complained to Defendant about this improper collection and requested that the abatement be applied. Defendant failed to honor the abatement provision or refund the amounts improperly collected. The total royalties improperly charged and collected during the abatement period amount to approximately $2,844.27.

Fees for Services Not Provided

69. Defendant collected fees from Plaintiffs for services and programs that were not delivered. Specifically:

a. Defendant charged Plaintiffs for secret shopper evaluations during multiple quarters. While evaluations were in fact completed, the corresponding reports were not forwarded to Plaintiffs until months later—and only after Weber specifically requested a refund on the charges. By the time the reports were provided, they were useless for any operational improvement purpose. As standard practice, secret shoppers were scheduled by corporate quarterly without advance notice to franchisees, who would learn of the evaluation only upon receiving the report. The secret shopper program was ultimately discontinued without credit or refund to

Plaintiffs for the fees collected during quarters when reports were not timely provided.

b. Defendant charged Plaintiffs convention fees for annual franchise conventions that either did not occur or that Plaintiffs did not receive the benefit of, without providing credits or refunds for these unused charges.

c. Defendant collected Brand Development Fees and technology fees from Plaintiffs throughout the period during which the digital visibility and marketing failures described above persisted—including the approximately eighteen-month period during which Plaintiffs' Carmel studio was invisible in digital channels and Defendant's sponsored advertising was being misdirected to the Market District studio. During this period, Plaintiffs received no proportional benefit from the Brand Development Fund and paid $7,581 in technology fees for technology services that were not functioning as represented.

<u>Unauthorized Cross-Entity ACH Withdrawal</u>

70. On or about December 5, 2024—more than five months after the Noblesville studio had closed—Defendant executed an ACH debit of $3,026.57 from the bank account of Plaintiff MWL Indiana LLC, the Carmel studio entity, to satisfy invoices belonging to JMW Indiana LLC, the Noblesville studio entity. MWL Indiana LLC and JMW Indiana LLC are separate and distinct legal entities. The ACH authorization executed by Weber authorized entity-specific debits only. No authorization existed—written or otherwise—for Defendant to debit one entity's account to satisfy the obligations of another.

71. Weber discovered the unauthorized withdrawal on December 5, 2024, and immediately notified Defendant in writing, stating: "There were invoices in the amount of $3K ACH debited

today from my Carmel account for Noblesville invoices. This was never approved by me and is illegal. You cannot ACH for invoices for another entity. In addition I do not believe some of the accounting is correct. I have payroll tomorrow and now funds are not there. No one stated there was going to be an ACH debit." The withdrawal threatened Plaintiffs' ability to meet payroll obligations for the Carmel studio and caused immediate operational disruption.

72. Weber reversed the debit through her bank. Whether Defendant formally admitted the cross-entity withdrawal was improper is subject to confirmation through discovery. In January 2026, Defendant demanded repayment of the $3,026.57 and characterized Weber's bank reversal as a breach of the Franchise Agreement—effectively demanding that Plaintiffs ratify an unauthorized withdrawal that Defendant had no contractual authority to make.

Unilateral Change to ACH Deduction Schedule

73. In October 2025, without prior notice to Plaintiffs and without contractual authority, Defendant unilaterally changed the frequency of ACH debits for royalties and Brand Development Fees from a bimonthly schedule to daily withdrawals. This change was implemented without any advance warning or notification whatsoever and occurred for a period of several days. While the total amount extracted during this period was not significant, the unilateral and unannounced nature of the change caused operational and cash flow disruption. The daily deduction practice was reversed only after Weber and other franchisees objected, but the financial disruption it caused during the period it was in effect was never remedied.

Pattern of Improper Financial Conduct

74. Defendant's financial misconduct was not limited to isolated incidents. Taken together—the failure to honor the royalty abatement, the collection of fees for services not provided, the unauthorized cross-entity ACH withdrawal, and the unilateral imposition of daily fee deductions—

Defendant's conduct reflects a sustained pattern of improper financial extraction from Plaintiffs throughout the franchise relationship. Each of these acts individually constitutes a breach of the Franchise Agreements and a violation of the Indiana Deceptive Franchise Practices Act. Collectively, they evidence a broader course of conduct designed to extract maximum financial benefit from Plaintiffs while Defendant simultaneously failed to deliver the support, services and protections the agreements required.

**G. Technology System Failures**

75. Defendant's technology-related failures span the entire operative period of the franchise relationship—from the deficient setup of the original MyTime point-of-sale system at the Carmel studio's opening in October 2022 through the mismanaged mandatory migration to the Mindbody platform beginning in September 2025, with disruptions continuing into 2026.

<u>The MyTime POS System—Opening Failures</u>

76. As described in Section E above, Defendant failed to establish Plaintiffs' MyTime POS account in a timely manner prior to the Carmel studio's October 10, 2022 opening. In fact, the MyTime account setup was not initiated until October 5, 2022—five days before opening—when Natalie Forbush of MyTime's Integrated Payments team contacted Weber to begin the merchant account setup process. This was despite Defendant's own pre-opening checklist requiring the MyTime account to be set up four to six weeks before opening to enable staff scheduling, inventory entry, appointment booking, and payment processing. As a result, Plaintiffs' Carmel studio opened without a functioning POS system, without online booking capability through the corporate website, and without the ability to process transactions—core operational failures that disrupted the studio's launch and impaired early client acquisition.

<u>The Mandatory Mindbody Migration—September 2025</u>

77. In or around September 2025, Defendant mandated a system-wide migration from the MyTime POS platform to the Mindbody platform. The migration launch date for Plaintiffs' Carmel studio was September 18, 2025. Weber requested on more than one occasion to be placed in a later group launch date and was denied by Karli Blair. Plaintiffs were not offered the option to delay the transition, and were placed among the first franchisees to undergo the rollout despite known deficiencies in the migration process.

78. Defendant represented that the Mindbody transition would be supported by adequate pre-launch assistance, parity in features and functionality among all studios, and sufficient training. These representations were not fulfilled. The migration was marred by pervasive technical failures that fell disproportionately on Plaintiffs' studio, including:

a. Loss and corruption of client appointment histories and records;

b. Incomplete and mishandled migration of client credit card information and membership data, leaving members unable to be billed and memberships frozen or misapplied;

c. Double charges to clients, causing client complaints and cancellations;

d. Errors in product and service inventory listings, including unavailability of add-ons and inventory items accessible to other studios in the Deka Lash system;

e. Loss of access to administrative reports and historical business data critical to payroll calculations, revenue tracking, and operational management;

f. Payroll calculation failures resulting from missing or corrupted data;

g. Ongoing software errors and permission restrictions that prevented Weber from making adjustments available to other franchisees; and

h. Price errors displayed on Plaintiffs' public-facing website.

79. Weber notified Defendant of these failures promptly following the September 18, 2025 launch date, documenting that the issues were causing extreme disruption to daily operations—as a business, for staff, and for clients.

80. Defendant's response was inadequate. Rather than provide direct corporate support to resolve the migration failures, Defendant instructed franchisees experiencing problems to seek solutions among themselves or contact the Mindbody vendor directly, effectively distancing itself from responsibility for a transition it had mandated. Defendant simultaneously directed franchisees not to contact the main corporate customer service center due to call volume, leaving Weber without a functional support channel during the most disruptive period of the transition.

Ongoing Failures Into 2026

81. The operational disruptions caused by the Mindbody migration were not resolved within weeks of the September 2025 launch. Problems with missing client data, nonfunctional memberships, payroll complications, inaccessible reports, and unresolved software errors persisted through the remainder of 2025 and into 2026. Inadequate administrative training and reference materials for the Mindbody platform compounded these problems, leaving Weber and her staff without adequate guidance to operate the new system effectively. As of January 2026, certain issues remained unresolved.

82. Throughout the period of Mindbody migration failures, Plaintiffs continued to pay Defendant's monthly technology fee of $399, receiving in return a technology platform that was nonfunctional in critical respects and for which Defendant refused to provide adequate direct support.

Mandatory Promotions—System Failures

83. Defendant also imposed mandatory system-wide promotional campaigns—including a "SUMMER99" promotion and a Black Friday event—that were implemented with defective technical controls. These promotions were not restricted to new clients as represented, could not be technically limited as promised, and were posted with incomplete disclaimers, causing revenue harm and administrative disruption to Plaintiffs' studio. Weber's objections to these promotions and requests to opt out were not honored. The flawed implementation of these mandated promotions further eroded Plaintiffs' membership revenues and compounded the financial harm caused by Defendant's other failures.

**H. Damages**

84. As a direct and proximate result of the conduct alleged herein, Plaintiffs have suffered substantial damages that extend through the closure of both franchise locations and into 2026, and that will be established with greater precision through discovery and expert testimony. The following categories of loss are documented in the record and are offered here to apprise the Court of the scope of harm Plaintiffs have suffered.

<u>Initial Investment and Franchise Development Fees</u>

85. As of opening day October 10, 2022, Plaintiffs' total investment in the Carmel location was $391,528, plus the franchise fee of $37,000, for a total opening investment of $428,528. Additional funds were invested from that time forward, including funds drawn from personal stock holdings, the liquidation of which resulted in capital gains taxes and the loss of future income on those investments. All investment was funded from Weber's personal resources without any business loan or third-party financing. Weber financed her entire franchise investment from personal savings, personal credit, and ultimately the proceeds of the sale of her personal home.

86. Plaintiffs paid a total of approximately $147,800 in franchise development fees across all four territories purchased: $89,900 for Territories 1 and 2 (Noblesville and Carmel), $16,000 for Territory 3 (Florida), and $41,900 for Territory 4 (Florida). As a direct result of Defendant's conduct, Plaintiffs were unable to open Territories 3 and 4—which were required to open by June 29, 2024 and June 29, 2025 respectively—and lost the entire value of the development fees paid for those territories. Defendant made no meaningful effort to assist Weber in selling those territories despite representing that it would do so, and Weber received no correspondence, feedback, or updates from Defendant regarding territory resale despite repeated requests.

<u>Fees Paid for Services Not Received</u>

87. Plaintiffs paid Defendant the following amounts for services and obligations Defendant failed to deliver:

a. Operations Onboarding and Location Assistance Fees of $5,450 (a one-time fee paid upon execution of the first FDD), for onboarding support that was materially deficient and in significant part not delivered. Additionally, Evans' withdrawal occurred prior to finalization of lease negotiations on the Noblesville location, further compounding the failure of support.

b. Non-Refundable Training Fees of $3,500 per location, totaling $7,000, for initial training that was delayed, rescheduled with inadequate notice, and in the case of the Carmel studio, deficiently performed by a trainer who refused to provide required hands-on instruction.

c. Royalties of approximately $2,844.27 charged and collected during the contractual abatement period from October 2022 through June 2023, during which no royalties were owed.

d. Technology fees of approximately $7,581 paid during the approximately eighteen-month period from October 2022 through March 2024 during which Plaintiffs' Carmel studio was invisible in digital channels and Defendant's technology systems were failing to function as required.

e. Secret shopper fees charged during quarters in which evaluations were completed but reports were not forwarded to Plaintiffs until months later and only upon request, rendering them useless for operational purposes, and convention fees charged for a 2024 annual convention that did not occur, in amounts to be established through discovery.

f. Brand Development Fund contributions paid throughout the operative period, for which Plaintiffs received no proportional benefit due to Defendant's sustained digital marketing failures, misdirected advertising, and the eighteen-month period of digital invisibility.

<u>Unauthorized Withdrawals</u>

88. In December 2024, Defendant made an unauthorized ACH withdrawal of $3,026.57 from MWL Indiana LLC's Carmel account to satisfy obligations of JMW Indiana LLC, the closed Noblesville studio—without authorization, notice, or contractual basis. This withdrawal threatened Plaintiffs' ability to meet payroll obligations for the Carmel studio. Though reversed at the bank, Defendant subsequently demanded repayment in January 2026 and characterized the reversal as a breach of contract.

<u>Closure of the Noblesville Location and Lease Settlement</u>

89. The Noblesville studio closed on June 15, 2024, as a direct and proximate result of Defendant's sustained failures, including eighteen months of digital invisibility that deprived both

studios of revenue during their critical early operating periods and forced Weber to spend thousands of dollars on independent marketing that should not have been necessary.

90. To secure release from the Noblesville lease, Weber was required to pay $100,000 to the landlord—funds drawn from the proceeds of the sale of her personal Indiana home, which closed on September 6, 2024. Weber had no other source of funds available for this payment, having exhausted her personal savings in an effort to sustain both studios in the face of Defendant's ongoing failures.

91. In the depths of her financial crisis, Weber also listed her Florida condominium for sale in an effort to liquidate every available personal asset to sustain the franchise operations Defendant was failing to support. The Indiana home sale proceeds were used to fund the $100,000 Noblesville lease settlement, pay back rent owed on the Carmel studio, cover attorneys' fees incurred in connection with the closure, and provide a minimum remaining reserve—leaving Weber with insufficient funds to sustain herself personally or to adequately capitalize the Carmel studio in its remaining operational period.

Loss of Two Additional Territories

92. Weber purchased four franchise territories at a total cost of $147,800. The financial devastation caused by Defendant's failures made it impossible for Weber to open Territories 3 and 4 within the required development schedule. As a result, Weber lost the entire value of the development fees paid for those territories—approximately $57,900—and was unable to pursue the multi-unit franchise investment she had planned and paid for.

Ongoing Losses and Personal Financial Devastation

93. Both franchise locations are now closed. The Carmel studio closed on March 15, 2026. At the time of the Carmel closure, the landlord had requested mediation regarding remaining lease

obligations and back rent. Weber has never paid herself a salary or distribution from either franchise entity. By the time Defendant's digital failures were partially remedied in early 2024, Weber had exhausted her life savings, maxed out her personal credit, and was unable to pay rent, payroll, or personal living expenses. She was forced to sell her Indiana home in September 2024, relocate to her condominium in Florida, and left her youngest child behind in Indiana to complete his final year of high school. Weber also liquidated personal stock holdings to sustain the studios, incurring capital gains taxes and losing further income on those investments.

Aggregate Damages

94. The cumulative losses sustained by Plaintiffs—including franchise fees, development fees for territories lost, initial investment costs, operating losses across both studios, lease settlement obligations, independent marketing expenditures, fees paid for services not delivered, and the personal financial devastation Weber has suffered—total approximately $2,000,000. This figure will be established with greater specificity through discovery, financial records, and expert testimony.

95. Plaintiffs further seek recovery of all fees and amounts improperly collected by Defendant, pre-judgment and post-judgment interest, attorneys' fees and costs as permitted by law and the Indiana Deceptive Franchise Practices Act, and such other damages as the evidence may support.

Punitive Damages

96. Plaintiffs further seek an award of punitive damages against Defendant. Defendant's conduct, as alleged herein, was not the product of mere negligence, inadvertence, or isolated operational failure. It reflects a sustained, knowing, and deliberate course of conduct spanning more than four years—from the pre-sale misrepresentations made to induce Weber's investment in 2021 through the unauthorized financial extractions, technology system failures, and retaliatory

demands continuing into 2026—that Defendant pursued with conscious disregard for Plaintiffs' rights and with full knowledge of the financial devastation that conduct was causing.

97. Specific acts supporting an award of punitive damages include the following:

a. Defendant's representatives made oral profitability representations to Weber during organized pre-sale due diligence calls that directly contradicted the FDD's own express prohibitions on unauthorized financial performance representations—representations Defendant knew it was prohibited from making and knew were unsupported by its internal franchisee performance data.

b. Defendant permitted the Market District studio to use "Carmel" in its name, directed Plaintiffs' own independent contractor to provide indistinguishable social media services to the competing studio, and permitted sponsored advertising paid for by Plaintiffs to display the competing studio's address, imagery, and contact information—all while collecting Plaintiffs' Brand Development Fund contributions and technology fees and representing in writing that the issues were being investigated and corrected.

c. Defendant made repeated written representations to Weber that specific corrective actions were being taken—including representations by Karli Blair in October and November 2023 that Plaintiffs' studio had been added to Apple Maps and local directories—that were demonstrably false, as Weber documented that the same failures persisted for months following each representation.

d. Defendant extracted $3,026.57 from MWL Indiana LLC's account in December 2024 to satisfy the obligations of a separate and distinct legal entity without authorization or contractual basis, and then in January 2026 demanded repayment

and characterized Weber's bank reversal as a breach of contract—seeking to enforce the financial consequences of its own unauthorized conduct against a franchisee Defendant knew was operating under severe financial distress.

e. Defendant unilaterally imposed daily ACH withdrawals for royalties and Brand Development Fees in October 2025 without notice or contractual authority, at a time when Defendant was fully aware of the financial strain the Carmel studio was operating under, reversing the practice only after multiple franchisees objected.

f. Defendant mandated Plaintiffs' migration to the Mindbody platform in September 2025—placing Plaintiffs in the first rollout group with no option to delay—while aware of known deficiencies in the migration process, and then directed franchisees experiencing failures to seek solutions among themselves rather than providing the direct corporate support Defendant had represented would be available.

98. The cumulative effect of this conduct was the complete financial devastation of a franchisee who invested her entire life savings, her personal credit, the proceeds of personal stock holdings, and ultimately, the proceeds of the forced sale of her family home into a franchise system Defendant was simultaneously failing to support and continuing to extract fees from. Weber was left unable to pay herself a salary and unable to afford personal living expenses, with no prospect of recovering her investment absent the relief sought in this action. Defendant's sustained and deliberate indifference to these consequences—and its continued pursuit of financial extractions and adverse demands even as Weber's situation became increasingly desperate—reflects the degree of malice, fraud, and conscious disregard for Plaintiffs' rights that warrants an award of punitive damages under applicable law.

99. The Franchise Agreements' mutual punitive damages waiver is void and unenforceable as contrary to Indiana public policy and as a provision prohibited by the Indiana Deceptive Franchise Practices Act, *Burns Ind. Code Ann.* § 23-2-2.7-1, which prohibits franchisors from including provisions in franchise agreements that limit litigation or restrict the remedies available to franchisees. Plaintiffs specifically seek reformation of this provision pursuant to *Burns Ind. Code Ann.* § 23-2-2.7-4 and assert their right to seek punitive damages notwithstanding the waiver.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

100. Plaintiffs repeat and reallege paragraphs 1 through 99 as if fully set forth herein.

101. This claim is governed by Indiana law. Indiana has the most significant relationship to this dispute under applicable conflicts of law principles: both franchise locations were situated in Indiana, all franchise operations occurred in Indiana, Plaintiffs are Florida and Indiana residents and Indiana entities, and the franchise relationship was performed entirely in Indiana. To the extent the Franchise Agreements' Pennsylvania choice-of-law provision is enforceable—which Plaintiffs dispute—Plaintiffs alternatively plead breach of contract under Pennsylvania law. Application of Pennsylvania law to extinguish Plaintiffs' non-waivable rights under the Indiana Deceptive Franchise Practices Act would violate Indiana's fundamental public policy and is therefore impermissible under Indiana conflicts of law principles. *See Burns Ind. Code Ann.* § 23-2-2.7-1.

102. Plaintiffs and Defendant entered into two Franchise Agreements—the first dated June 29, 2021, governing the Noblesville studio operated by JMW Indiana LLC and the Carmel studio subsequently operated by MWL Indiana LLC, as well as a third Florida territory; and the second dated October 4, 2021, governing a fourth Florida territory. Both Franchise Agreements are valid and binding contracts supported by adequate consideration. Plaintiffs performed all of

their material obligations under the Franchise Agreements, including timely payment of all required fees, royalties, and other amounts, except to the extent that Plaintiffs' performance was excused by Defendant's prior material breaches.

103. Defendant breached the Franchise Agreements in the following material respects, each of which independently constitutes a material breach and each of which deprived Plaintiffs of benefits they were entitled to receive under the agreements:

a. Territorial Protection—Defendant breached its obligation to protect Plaintiffs' Protected Areas by permitting a competing franchisee to execute a Letter of Intent for a site within Plaintiffs' territory in September 2021, withdrawing corporate support during the resulting dispute, and subsequently permitting the opening of the Market District studio approximately five miles from Plaintiffs' Carmel location in January 2023—a competing outlet that created direct market diversion, customer confusion, and competitive harm during Plaintiffs' crucial early operating period.

b. Digital Marketing and Brand Visibility—Defendant breached its obligations to maintain and control digital marketing for Plaintiffs' franchise locations by failing to establish and maintain accurate listings on Google Maps, Apple Maps, and Defendant's own studio directory for a period of approximately eighteen months from October 2022 through March 2024; by permitting sponsored advertising paid for by Plaintiffs to be misdirected to a competing location; by permitting a competing studio to use "Carmel" in its name, creating sustained customer confusion with Plaintiffs' studio; by restricting Plaintiffs' digital marketing radius to five miles while other franchisees were permitted to target areas of fifteen to

twenty-five miles; and by failing to fulfill its written assurances that these issues were being corrected.

c. Onboarding and Pre-Opening Support—Defendant breached its obligations to provide timely and adequate pre-opening operational support by failing to set up the MyTime POS system, studio phone, credit card merchant services, social media accounts, Google My Business page, and "coming soon" digital presence until days before or after the Carmel studio's October 10, 2022 opening, despite these obligations being required weeks in advance under Defendant's own pre-opening checklist and franchise documentation.

d. Initial Training—Defendant breached its obligation to provide initial training by rescheduling the Initial Lash Training for the Carmel studio with only four days' notice—in violation of Defendant's own standard requiring confirmation four weeks prior to opening—and by providing deficient training through a corporate trainer who refused to deliver the hands-on in-person lash technique instruction that was standard in the industry and that Defendant's own training protocols required.

e. Royalty Abatement—Defendant breached the express royalty abatement provision of the Franchise Agreement and FDD Item 6, Note 3 by charging and collecting royalties from Plaintiffs from October 2022 through June 2023—a period during which the Carmel studio's early opening more than eight months ahead of the June 29, 2023 development deadline entitled Plaintiffs to abatement of all royalty obligations. The amount improperly collected during the abatement period totals approximately $2,844.27.

f. Unauthorized ACH Withdrawals and Payment Practice Changes—Defendant breached the payment provisions of the Franchise Agreements and the entity-specific ACH authorizations executed by Plaintiffs by withdrawing $3,026.57 from MWL Indiana LLC's Carmel account in December 2024 to satisfy obligations of JMW Indiana LLC, a separate legal entity, without authorization or notice, and by unilaterally implementing daily ACH withdrawals for royalties and Brand Development Fees in October 2025 without the notice required under the Franchise Agreements, reversing this change only after Weber and other franchisees objected.

g. Fees for Services Not Provided—Defendant breached its obligations by collecting technology fees of approximately $7,581 during the eighteen-month period of digital invisibility, Brand Development Fund contributions, secret shopper fees for quarters in which evaluations were completed but reports were not timely delivered, and convention fees for a 2024 convention that did not occur.

h. Technology System Support—Defendant breached its obligation to provide functioning technology systems and to support required system transitions by mandating Plaintiffs' migration to the Mindbody POS platform in September 2025 without adequate pre-launch support, training, or preparation; by implementing a migration that caused data loss, double billing, frozen memberships, payroll failures, and loss of administrative reporting access; by directing franchisees experiencing migration failures to seek solutions among themselves rather than providing direct corporate support; and by permitting these failures to persist through 2026 without adequate remediation.

104. Each of the foregoing breaches was material. Taken individually, each deprived Plaintiffs of a core benefit of the franchise relationship for which they had contracted and paid. Taken together, Defendant's breaches rendered the franchise system Defendant sold to Plaintiffs functionally unworkable—depriving Plaintiffs of territorial protection, operational support, digital visibility, and the technology infrastructure required to operate a competitive franchise business.

105. Defendant will likely invoke the Franchise Agreements' one-year contractual limitations clause in an attempt to bar claims arising from conduct predating the filing of this action by more than one year. That clause is unenforceable for the following independent reasons:

a. First, the Indiana Deceptive Franchise Practices Act expressly prohibits franchisors from including provisions in franchise agreements that limit litigation arising from the franchise relationship. *Burns Ind. Code Ann.* § 23-2-2.7-1. A contractual provision that reduces the period within which a franchisee may bring claims is precisely the type of provision that IDFPA prohibits. Because Indiana law governs this franchise relationship, the one-year clause is void.

b. Second, Defendant's breaches were not isolated, discrete events but rather a continuing course of conduct—ongoing digital failures, continuing failure to honor the royalty abatement, repeated unauthorized fee collections, and sustained technology system failures—that constitutes a continuing wrong under Indiana law. As a continuing wrong, the limitations period does not begin to run until the wrongful course of conduct ceases. Defendant's misconduct has continued through 2025 and 2026, bringing the entirety of the claims within any applicable limitations period.

c. Third, Defendant is equitably estopped from invoking the limitations clause because Defendant's own representations—including repeated written assurances that digital issues were being corrected, that fees would be addressed, and that support was forthcoming—induced Plaintiffs to refrain from filing suit earlier in reliance on those representations, which proved false.

106. As a direct and proximate result of Defendant's breaches, Plaintiffs have suffered damages in an amount exceeding $2,000,000 including initial investment losses, franchise and development fees paid for territories that could not be opened, operating losses across both studio locations, lease settlement obligations, fees paid for services not delivered, independent marketing expenditures necessitated by Defendant's digital failures, and the losses sustained through the closure of the Carmel studio, all as more fully set forth in Section H above.

COUNT II
BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

107. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 106 as if fully set forth herein.

108. Under Indiana law, every contract contains an implied covenant of good faith and fair dealing that requires each party to act in a manner consistent with the reasonable expectations of the other party and to refrain from conduct that would deprive the other party of the benefit of the bargain. This covenant is particularly significant in the franchise context, where the franchisor retains broad discretionary authority over matters critical to the franchisee's business—including digital marketing, territorial decisions, technology system requirements, fee administration, and operational support—and where the franchisee is wholly dependent on the franchisor's good faith exercise of that discretion. Under applicable franchise law, including the principles recognized in *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978), and its progeny, a franchisor

owes its franchisees a duty of good faith and commercial reasonableness in the exercise of its contractual discretion, and may not exercise that discretion arbitrarily, capriciously, or in a manner designed to benefit the franchisor at the franchisee's expense.

109. To the extent this count is governed by Pennsylvania law, the implied covenant claim is tied to specific contractual provisions of the Franchise Agreements in which the Defendant exercised contractual discretion in bad faith, as set forth below. To the extent Indiana law governs, the implied covenant operates as an independent basis for relief arising from Defendant's sustained course of bad faith conduct in the performance of the Franchise Agreements.

110. Defendant breached the implied covenant of good faith and fair dealing by exercising its broad contractual discretion arbitrarily, unreasonably, and in bad faith, thereby depriving Plaintiffs of the essential benefits of the franchise relationship. Defendant's bad faith conduct includes the following specific acts, each of which is tied to a specific contractual provision under which Defendant exercised discretionary authority:

a. Misdirection of Paid Advertising—Defendant exercised its marketing control in bad faith by permitting sponsored advertising paid for by Plaintiffs to display the Market District studio's address, imagery, and contact information—including a ghost phone number routing to the competing studio. A franchisor exercising its marketing discretion in good faith and with commercial reasonableness would not direct a franchisee's paid advertising spend to benefit a competing location in the same market. Defendant did so for nearly eighteen months, while collecting Plaintiffs' Brand Development Fund contributions and technology fees without adjustment or remedy.

b. Discriminatory Marketing Radius Restriction—The Franchise Agreements granted Defendant discretionary authority over digital marketing parameters. In October 2023, Defendant exercised this authority in bad faith by restricting Plaintiffs' digital marketing radius to five miles while permitting other franchisees to target areas of fifteen to twenty-five miles. This discriminatory restriction was imposed without adequate justification, without notice, and without any corresponding benefit to Plaintiffs—at a time when Plaintiffs' studio was already severely disadvantaged by eighteen months of digital invisibility. The restriction further compounded Plaintiffs' competitive disadvantage relative to other franchisees in the Deka Lash system and was a direct exercise of Defendant's contractual marketing discretion in a manner designed to benefit the system at Plaintiffs' particular expense.

c. Withdrawal During Territorial Dispute—The Franchise Agreements granted Defendant's corporate broker authority to facilitate site selection and coordinate the development process on Defendant's behalf. Defendant exercised this authority in bad faith by withdrawing corporate broker Josh Evans from the pre-opening coordination process at the moment Weber most needed his assistance, and did so while Weber was still finalizing lease negotiations for the Noblesville location. Defendant's withdrawal during the territorial dispute was a direct exercise of its discretional authority over the development process, exercised in a manner that benefited the competing franchisee and penalized Plaintiffs for asserting their contractual rights.

d. Collection of Royalties During Abatement Period—The Franchise Agreements granted Defendant authority to administer the royalty collection process. Defendant

exercised this authority in bad faith by continuing to collect royalties from Plaintiffs from October 2022 through June 2023—a period during which the express terms of the Franchise Agreement and FDD prohibited royalty collection—despite Weber's repeated objections and request for correction. A franchisor administering its royalty collection process in good faith and with commercial reasonableness would have honored an express written abatement provision rather than continuing to collect amounts it was contractually prohibited from collecting.

e. The Unauthorized Cross-Entity ACH Withdrawal and Subsequent Demand—The Franchise Agreements and ACH authorizations granted Defendant authority to initiate automated payment collections from Plaintiffs' designated accounts. Defendant exercised this authority in bad faith in December 2024 by withdrawing $3,026.57 from MWL Indiana LLC's Carmel account to satisfy the obligations of JMW Indiana LLC—without authorization, notice, or contractual basis, at a time when Weber had explicitly communicated to Defendant that she was struggling to meet payroll. Defendant's subsequent demand in January 2026 that Weber repay the reversed withdrawal—and its characterization of her bank reversal as a breach of contract—further reflect bad faith conduct designed to extract financial benefit from Plaintiffs through means Defendant had no contractual authority to employ.

f. Selective and Preferential Treatment of Competing Franchisees—The Franchise Agreements granted Defendant discretionary authority over the provision of operational support, digital marketing assistance, and technology services to franchisees. Defendant exercised this authority in bad faith by providing the Market District studio with prominent digital visibility—including a "coming soon" listing

before it had even opened—while simultaneously failing to establish or maintain Plaintiffs' Carmel studio in any digital channel for eighteen months after opening. Defendant further permitted the Market District studio to use "Carmel" in its name and directed Weber's own independent contractor to provide indistinguishable social media services to both studios—conduct that can only be characterized as preferential treatment of a competing franchisee at Plaintiffs' direct expense. This selective exercise of Defendant's marketing and brand management discretion deprived Plaintiffs of the equal treatment and commercial reasonableness that the implied covenant requires.

g. Mandating a Technology Migration Without Adequate Support—The Franchise Agreements granted Defendant authority to require franchisees to adopt new technology systems. Defendant exercised this authority in bad faith by mandating Plaintiffs' migration to the Mindbody platform in September 2025 without adequate preparation, training, or support; by placing Plaintiffs in the first rollout group without offering any option to delay despite known deficiencies in the migration process, despite Plaintiffs' request to be placed in a later rollout group; by instructing franchisees experiencing migration failures to seek solutions among themselves rather than providing direct corporate support; and by restricting access to corporate customer service during the period of greatest disruption. A franchisor exercising its technology mandate authority in good faith would not simultaneously require a transition and disclaim responsibility for its failures.

111. Defendant's bad faith acts were not isolated. They reflect a sustained pattern of conduct spanning from the pre-opening period in 2021 through continuing misconduct in 2025 and

2026, in which Defendant consistently exercised its broad contractual discretion in ways that extracted maximum financial benefit from Plaintiffs while systematically failing to provide the support, visibility, protection, and infrastructure that the franchise relationship required. At every critical juncture—the territorial dispute, the digital failures, the royalty abatement, the technology transition—Defendant exercised its discretion arbitrarily and unreasonably, in a manner that served Defendant's interests at Plaintiffs' expense and that deprived Plaintiffs of the reasonable expectations of a functioning, supported, protected franchise system.

112. As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages in an amount exceeding $2,000,000, as more fully set forth in Section H above. These damages include, but are not limited to, the losses caused by misdirected advertising, discriminatory marketing restrictions, royalties improperly collected, fees paid for services not rendered, losses attributable to the digital visibility failures, and the operational and financial harm caused by the Mindbody migration failures extending through the closure of both franchise locations.

COUNT III
FRAUDULENT INDUCEMENT

113. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 112 as if fully set forth herein.

114. This count is governed by Indiana law. Under Indiana law, the statute of limitations for fraud is six years. *Burns Ind. Code. Ann.* § 34-11-2-7(4). To the extent Pennsylvania law is found to govern, Plaintiffs alternatively plead fraudulent inducement under Pennsylvania law, and allege that the applicable two-year limitations period is tolled by the discovery rule, fraudulent concealment, and the continuing wrong doctrine, as set forth below.

115. Prior to executing the first Franchise Agreement on June 29, 2021, Weber participated in due diligence calls organized by Defendant for prospective franchisees. Multiple Deka Lash representatives—including Karli Blair, Joe Gordon, Shallyn Rold, and Troy McCullen—made specific and direct representations that it takes nine months (and later eighteen months) to be profitable as a Deka Lash franchisee. Weber was then a prospective investor considering an investment requiring hundreds of thousands of dollars in initial fees, leasehold improvements, equipment, and operating capital. The timeline for achieving profitability was directly material to her decision whether to invest, how much to invest, and whether the investment was financially prudent. The representations were made in direct response to questions from prospective franchisees, on calls organized by Defendant as part of its franchise sale process. In addition, Defendant provided Weber with a pro forma template containing built-in calculations and formulas that further reinforced the profitability representations.

116. Defendant provided Weber with its FDD on May 26, 2021, approximately thirty-four days before signing. Item 19 of the FDD disclosed only average gross revenues of approximately $204,037 during fiscal year 2020—a pandemic year—and disclosed no net profit data whatsoever. The FDD contained no representation that any Deka Lash franchisee had achieved profitability within nine or eighteen months of opening, and contained no data from which such a conclusion could reasonably be drawn.

117. The oral profitability representations were not authorized by the FDD. To the contrary, the FDD expressly prohibited Defendant's personnel from making financial performance representations beyond those contained in Item 19, and instructed prospective franchisees to report any such outside representations. Notwithstanding those express prohibitions, various franchisor representatives made the profitability representations described above to Weber and other

prospective franchisees during organized due diligence calls that Defendant itself arranged and conducted as part of its franchise sales process.

118. The representations made by franchise representatives were false at the time they were made. Defendant possessed internal financial data regarding the actual performance of its franchisees—including net profitability timelines across its franchise system—that it did not disclose in the FDD or otherwise provide to Weber. The gross revenue figures disclosed in Item 19, standing alone, were facially insufficient to support a nine-to-eighteen-month profitability representation after accounting for the substantial operating costs franchisees were required to bear. Defendant knew, or recklessly disregarded, that its franchisees were not achieving net profitability within nine to eighteen months of opening at the time these representations were made. The oral representations directly contradicted the FDD's own express prohibition on unauthorized financial performance representations—a prohibition that itself reflects Defendant's awareness that such representations were material, unauthorized, and potentially misleading.

119. Weber reasonably relied on these representations in deciding to execute both Franchise Agreements. Had Weber known that Deka Lash franchisees were not achieving profitability within nine to eighteen months—and that Defendant had no reasonable basis for representing that they would—she would not have entered into either Franchise Agreement or made the investment those agreements required.

120. Defendant's integration clause and closing acknowledgment provisions do not bar this claim, should Defendants attempt to invoke such provisions, for the following reasons:

a. First, under Indiana law, an integration clause does not bar a fraudulent inducement claim where the misrepresentations were made to induce the very execution of the agreement containing the integration clause. A party cannot use a contractual

provision to insulate itself from liability for the fraud that induced the other party to agree to that provision in the first place.

b. Second, the closing acknowledgment provisions in the Franchise Agreements—in which Weber acknowledged that she was not relying on any representations outside the FDD—do not constitute fraud-insulating no-reliance language sufficient to bar this claim. Under Indiana law, a general acknowledgment of non-reliance does not bar a fraudulent inducement claim where, as here, the specific misrepresentations were made by Defendant's own representatives in the course of Defendant's organized franchise sales process. To hold otherwise would allow franchisors to insulate themselves from liability for precisely the type of fraudulent conduct the Indiana Deceptive Franchise Practices Act was designed to prevent.

c. Third, to the extent the acknowledgment provisions are construed as a bar to this claim, those provisions were themselves procured by the same fraudulent scheme—Weber would not have executed the acknowledgments had she not been induced to sign the Franchise Agreements by the false profitability representations in the first place.

121. Under Indiana's six-year fraud statute of limitations, this claim is timely. *See Burns Ind. Code Ann.* § 34-11-2-7. The first Franchise Agreement was executed on June 29, 2021, and the second on October 4, 2021, both within six years of the filing of this action. And to the extent Pennsylvania's two-year limitations period is found to apply, this claim is timely under the discovery rule. Weber did not discover, and could not in the exercise of reasonable diligence have discovered, that the profitability representations were false until she had experienced years of underperformance that she could not attribute to her own operational failures—a realization that

did not become apparent until the full scope of Defendant's failures were revealed, including the resolution of the digital visibility issues in early 2024. The discovery rule tolls the limitations period until the plaintiff knew or reasonably should have known of the injury and its cause. Weber could not have known that the profitability representations were false—rather than that her studios were underperforming for correctable operational reasons—until Defendant's own sustained failures made clear that the promised nine-to-eighteen-month profitability timeline had no basis in reality. Additionally, Defendant's own conduct—including repeated written assurances that digital and operational issues were being corrected—constitutes fraudulent concealment that independently tolls any applicable limitations period. A defendant who conceals the facts giving rise to a fraud claim cannot invoke a limitations period that began to run on the date of the fraud.

122. As a direct and proximate result of Defendant's fraudulent inducement, Weber has suffered damages in an amount exceeding $2,000,000, including the entirety of her personal investment in the franchise system—funded from personal savings, personal credit, the proceeds of personal stock holdings, and ultimately the proceeds of the forced sale of her home—all of which would not have been made but for Defendant's false representations regarding the profitability timeline for Deka Lash franchisees. These damages are personal to Weber as the individual who relied on the misrepresentations and made the investment decision at issue, and are in addition to the entity-level damages suffered by JMW Indiana LLC and MWL Indiana LLC.

## COUNT IV
## FRAUD AND MISREPRESENTATIONS (POST-SALE CONDUCT)

123. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 122 as if fully set forth herein.

124. This count is distinct from Count III. Count III addresses pre-sale misrepresentations made to induce Plaintiffs to enter into the Franchise Agreements. This count

addresses a separate and independent course of fraudulent conduct that occurred after the Franchise Agreements were executed—specifically, Defendant's repeated affirmative misrepresentations to Plaintiffs during the operative period of the franchise relationship that known problems were being investigated, addressed, and corrected, when in fact Defendant knew those representations were false or made them with reckless disregard for their truth. This post-sale fraud is independently actionable and is not subject to the integration clause or acknowledgment provisions of the Franchise Agreements, which by their terms apply only to pre-contractual representations.

125. This count is governed by Indiana law. Under Indiana law, the statute of limitations for fraud is six years. *Burns Ind. Code Ann.* § 34-11-2-7(4). The most recent post-sale misrepresentation alleged herein occurred within six years of the filing of this action, and many occurred within the past two to three years. To the extent Pennsylvania law is found to govern, Plaintiffs alternatively plead post-sale fraud under Pennsylvania law and allege that the applicable limitations period is tolled by the discovery rule and fraudulent concealment, as set forth below.

126. Defendant made the following specific affirmative misrepresentations to Plaintiffs during the operative period of the franchise relationship, each of which was false at the time it was made or made with reckless disregard for its truth, and each of which caused Plaintiffs to continue investing in and operating the franchise in reliance on representations that the problems they were experiencing would be resolved:

a. The Digital Visibility Misrepresentations in June 2023—On or about June 5, 2023, Kiara Martilla, a representative of Defendant, responded in writing to Weber's documented complaints regarding the Carmel studio's absence from Google search results and the Market District studio's prominence in searches for "Deka Lash Carmel." Martilla acknowledged that Weber's concerns about the Market District

Carmel studio appearing in searches while Plaintiffs' studio did not was "valid," stated that Defendant had reviewed the preliminary settings and found nothing that would block Google from indexing Plaintiffs' page, and represented that Defendant would "continue to research this throughout this week to determine what may be causing this issue" and would "keep you updated on what we find." These representations were false or made with reckless disregard for their truth. Defendant did not conduct meaningful research, did not identify and correct the underlying cause of the visibility failure, and did not keep Weber updated as represented. The digital visibility failures persisted for more than eight additional months following this representation.

b. The Market District Confusion Misrepresentations in October 2023—On or about October 3, 2023, Karli Blair, Defendant's Franchise Success Manager, responded in writing to Weber's detailed documented complaint regarding the Market District studio's use of "Carmel" in its name, the misdirection of Plaintiffs' sponsored advertising to the Market District location, and the competitive harm these issues were causing. Blair acknowledged that "there is a current problem" and represented that Defendant would "find a solution." Blair further represented that Defendant had "a scheduled call next week with Market District to ensure their targeting on Google is correct" and that Defendant was "currently assessing the backend of Meta and the website." With respect to the Apple Maps issue, Blair represented that Defendant would "manually add your studio's listing to Apple Maps." These representations were false or made with reckless disregard for the truth. Despite Blair's written acknowledgment of the problem and specific representations about

corrective actions being taken, the Market District confusion issues, the misdirected advertising, and the Apple Maps invisibility all persisted for months following this representation. Apple Maps did not accurately reflect Plaintiffs' studio until March 2024—nearly five months after Blair's written representation that it would be manually corrected.

c. The November 2023 Misrepresentations—On or about November 27, 2023, Weber again documented in writing that her Carmel studio's corporate link still did not appear in Google searches for "Deka Lash Carmel" or "Deka Lash Indiana," and that no one had followed up with her following prior representations that the issues were being addressed. Blair responded the same day, representing in writing that Defendant had "completed the reindexing of your studio pages, including your studios on Apple Maps, listed your studios on local directories, and made adjustments to your metadata in an attempt to address the issue." These representations were false or made with reckless disregard for their truth. On February 22, 2024—nearly three months after Blair's representation that the studio had been included on Apple Maps and local directories—Weber documented that her studio still did not appear on Apple Maps, that no dot appeared on the map for her studio location, and that only Market District information appeared in response to searches for her studio. The issues represented as corrected in November 2023 had not been corrected.

d. The Onboarding Support Misrepresentations—During the pre-opening period from August through October 2022, Defendant's representatives—including corporate broker Josh Evans, digital coordinator Karli, and Franchise Success Team member

Troy McCullen—made repeated representations to Weber that the outstanding pre-opening setup items, including the MyTime POS account, social media profiles, Google My Business page, and digital "coming soon" listing, were being set up and would be completed. These representations were false or made with reckless disregard for their truth. As documented in detail in the Factual Allegations above, none of these items were completed by the required deadlines, and most were not completed until days before or after the Carmel studio's opening on October 10, 2022, notwithstanding Defendant's representatives' ongoing assurances that they were being addressed.

e. The Mindbody Migration Misrepresentations in September 2025—In connection with the mandatory migration to the Mindbody platform beginning September 18, 2025, Defendant represented to Plaintiffs and other franchisees that the transition would be supported by adequate pre-launch assistance, parity in features and functionality among all studios, and sufficient training and reference materials. These representations were false or made with reckless disregard for their truth. The migration was marred by pervasive technical failures including data loss, double billing, frozen memberships, payroll failures, and inaccessible reports. Defendant's response was to direct franchisees to seek solutions among themselves or through the Mindbody vendor and to restrict access to corporate customer service—conduct wholly inconsistent with the pre-launch representations of adequate support. These failures persisted through 2026.

f. The Franchisor's Admission and Subsequent Demand—In connection with the December 2024 unauthorized ACH withdrawal of $3,026.57 from MWL Indiana

LLC's Carmel account, Defendant subsequently characterized the cross-entity debit as a matter subject to dispute. Notwithstanding any such characterization, in January 2026, Defendant demanded repayment of the reversed withdrawal and characterized Weber's bank reversal as a breach of the Franchise Agreement. This demand constitutes a post-sale misrepresentation of Plaintiffs' contractual obligations—representing to Plaintiffs that they were contractually obligated to ratify a withdrawal Defendant had no contractual authority to make.

127. In addition to the affirmative misrepresentations described above, Defendant engaged in fraudulent concealment by failing to disclose to Plaintiffs the following material facts that Defendant knew and that Plaintiffs could not have discovered through reasonable diligence:

a. That Defendant's own digital marketing systems had been configured in a manner that caused the Market District studio to appear in searches for Plaintiffs' studio while suppressing Plaintiffs' listings—a technical configuration within Defendant's exclusive control that Defendant did not disclose to Weber despite her repeated complaints.

b. That sponsored advertising campaigns run by Defendant's approved vendors on Plaintiffs' behalf were including the Market District studio's address, imagery, and contact information rather than Plaintiffs'—a fact within Defendant's and its vendors' knowledge that was not disclosed to Weber until she independently discovered the misdirected ads and sent screenshots to Defendant's representatives in September 2023.

c. That known deficiencies in the Mindbody migration existed prior to Defendant's mandating the transition for Plaintiffs' studio group in September 2025, which

Defendant concealed by representing that the transition would be supported by adequate pre-launch assistance and parity in features.

Defendant's fraudulent concealment of these material facts independently tolls any applicable statute of limitations and independently supports this cause of action.

128. Plaintiffs reasonably relied on Defendant's post-sale misrepresentations to their detriment. Specifically, Weber continued to invest personal funds in both franchise locations, continued to pay Defendant's fees and royalties, continued to operate the studios without seeking immediate legal or contractual remedies, and refrained from filing suit at an earlier date—all in reasonable reliance on Defendant's repeated written representations that the problems Plaintiffs were experiencing were being investigated and corrected. Had Defendant not made these repeated misrepresentations, Plaintiffs would have sought legal remedies at an earlier stage of the franchise relationship, before the financial losses had compounded to the extent they ultimately did. The damages Plaintiffs suffered as a result of Defendant's post-sale misrepresentations are therefore not limited to the losses that had already occurred at the time the first misrepresentation was made—they include the additional losses that accumulated during the period that Plaintiffs were induced to continue operating and investing in reliance on Defendant's false assurances.

129. The foregoing allegations satisfy the requirements of Federal Rule of Civil Procedure 9(b). Each misrepresentation is identified with specificity as to the speaker and their role within Defendant's organization; the date or approximate date on which the representation was made; the medium through which it was made (written email correspondence, in each of the primary instances); the specific content of the representation; the falsity of the representation and the basis for that falsity; and Plaintiffs' reliance on the representation to their detriment.

130. As a direct and proximate result of Defendant's post-sale fraud and misrepresentation, Plaintiffs have suffered damages in an amount exceeding $2,000,000, as more fully set forth in Section H above. These damages include but are not limited to the operating losses, independent marketing expenditures, fees paid for services not rendered, and personal financial harm that accumulated during the period Plaintiffs were induced to continue investing in and operating the franchise in reliance on Defendant's false assurances that the problems they were experiencing were being corrected. Plaintiffs further seek all other relief available under applicable law for fraudulent misrepresentation, including disgorgement of fees collected during periods of false assurance.

## COUNT V
## UNJUST ENRICHMENT

131. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 130 as if fully set forth herein.

132. Plaintiffs bring this count in the alternative to their breach of contract claims set forth in Count I. To the extent a court determines that the Franchise Agreements do not govern the specific conduct alleged herein, or that any provision of the Franchise Agreements is void, unenforceable, or otherwise inapplicable to the specific payments and conduct at issue, Plaintiffs are entitled to restitution and disgorgement under the doctrine of unjust enrichment. Plaintiffs do not waive their breach of contract claims by pleading this count in the alternative, and the Federal Rules of Civil Procedure expressly permit alternative and inconsistent pleading. *See* Fed. R. Civ. P. 8(d)(2)-(3).

133. This count is governed by Indiana law. Under Indiana law, a claim for unjust enrichment requires a plaintiff to show: (1) a benefit was conferred on the defendant by the plaintiff; (2) the defendant's acceptance or retention of the benefit; and (3) circumstances making

it inequitable for the defendant to retain the benefit without payment of its value. Recovery is available where a party has paid for services or benefits that were not delivered, where a party has paid amounts to which the recipient had no legal entitlement, or where retention of the funds by the recipient would be inequitable under all the circumstances.

134. Throughout the franchise relationship, Plaintiffs conferred substantial financial benefits on Defendant in the form of fees, royalties, and fund contributions paid for specific services, programs, and obligations that Defendant failed to deliver. In each of the following categories, Defendant received payment from Plaintiffs, retained those payments, and failed to provide the corresponding services or benefits for which the payments were made:

a. Operations Onboarding and Location Assistance Fees—Plaintiffs paid Defendant a non-refundable Operations Onboarding and Location Assistance Fee of $5,450, which was a one-time fee paid upon execution of the first FDD, in exchange for dedicated support for site selection, buildout, onboarding, and digital launch activities. Defendant accepted and retained these payments in full. The onboarding and location assistance services for which these fees were paid were materially and substantially not delivered—Defendant's corporate broker became nonresponsive at the critical juncture of the Carmel studio's pre-opening period, and did so while Weber was still finalizing lease negotiations on the Noblesville location, essential pre-opening setup items were completed only days before or after opening, and the digital launch support the fee was intended to fund was wholly absent on opening day. It would be inequitable for Defendant to retain $5,450 in fees for onboarding support it materially failed to provide.

b. Non-Refundable Training Fees—Plaintiffs paid Defendant a Non-Refundable Training Fee of $3,500 per location, totaling $7,000 across both locations, in exchange for adequate initial training of Plaintiffs' staff by Defendant's corporate trainers. Defendant accepted and retained these payments in full. The training provided for the Carmel studio was materially deficient—the corporate trainer rescheduled with inadequate notice, refused to provide required hands-on technical instruction, and was unable to complete meaningful training because the POS system Defendant was also responsible for setting up was not operational during the training period. Plaintiffs received substantially less than the training for which they paid $7,000. It would be inequitable for Defendant to retain these fees for training it materially failed to deliver.

c. Royalties During the Abatement Period—Plaintiffs paid Defendant royalties totaling approximately $2,844.27 during the period from October 2022 through June 2023, during which the Franchise Agreement and FDD expressly provided that no royalties were owed. Defendant had no legal entitlement to these payments. Defendant accepted and retained these royalty payments notwithstanding Plaintiffs' repeated objections and requests for correction. There is no legal or equitable basis for Defendant to retain payments it was contractually prohibited from collecting in the first place. It would be inequitable for Defendant to retain $2,844.27 in royalty payments to which it had no entitlement under the express terms of the parties' agreement.

d. Technology Fees During the Digital Failure Period—Plaintiffs paid Defendant technology fees of $399 per month throughout the approximately eighteen-month

period from October 2022 through March 2024, totaling approximately $7,581, during which Defendant's technology systems failed to provide Plaintiffs' Carmel studio with any functioning digital presence, accurate search listings, or effective sponsored advertising. During this period, the technology fees Plaintiffs paid were not applied to provide Plaintiffs with any proportional benefit—instead, the digital infrastructure Defendant was obligated to maintain directed customers away from Plaintiffs' studio and toward a competing location. Defendant accepted and retained these technology fee payments throughout this period without adjustment, credit, or refund. It would be inequitable for Defendant to retain $7,581 in technology fees collected during a period when the technology systems those fees were intended to fund were functionally working against Plaintiffs' interests.

e. Brand Development Fund Contributions During the Digital Failure Period—Plaintiffs were required to contribute one percent of gross studio sales to the Brand Development Fund throughout the operative period of the franchise relationship. During the approximately eighteen-month period of digital invisibility, Plaintiffs received no proportional benefit from these contributions—Defendant's sponsored advertising campaigns misdirected to the Market District studio were funded in part from the Brand Development Fund to which Plaintiffs were required to contribute, and Plaintiffs received no meaningful digital marketing benefit in return for their contributions during this period. Defendant accepted and retained these contributions without adjustment, credit, or refund. It would be inequitable for Defendant to retain Brand Development Fund contributions from a franchisee

whose studio received no benefit from—and was in fact harmed by—the marketing programs those contributions were intended to fund.

f. Secret Shopper Fees for Services Not Performed—Plaintiffs paid Defendant secret shopper fees at the rate of $75 per quarter plus the cost of the service throughout the relevant period, including during quarters in which evaluations were completed but reports were not forwarded to Plaintiffs until months later and only upon request, rendering them useless for any operational improvement purpose. Defendant accepted and retained these fees without providing timely and actionable reports. The secret shopper program was ultimately discontinued without credit or refund to Plaintiffs for fees collected during quarters when reports were not timely provided. It would be inequitable for Defendant to retain fees collected for a service that was not delivered as represented.

g. Convention Fees for a Convention That Did Not Occur—Plaintiffs paid Defendant convention fees for the 2024 annual franchise convention. No convention was held in 2024. Defendant accepted and retained the convention fees without providing the corresponding event or issuing any credit or refund to Plaintiffs. It would be inequitable for Defendant to retain fees for an event that did not occur.

h. The Unauthorized Cross-Entity ACH Withdrawal—In December 2024, Defendant withdrew $3,026.57 from MWL Indiana LLC's bank account to satisfy obligations of JMW Indiana LLC, a separate and distinct legal entity for whose obligations MWL Indiana LLC had no obligation and had given no authorization. Defendant had no legal entitlement to these funds from MWL Indiana LLC's account. Although Weber reversed this withdrawal through her bank, Defendant

subsequently demanded repayment and characterized the reversal as a breach—effectively seeking to retain or recover the benefit of an unauthorized withdrawal that Defendant had no contractual authority to make. It would be inequitable for Defendant to retain or recover the benefit of funds extracted from an entity account without authorization, for obligations of a separate entity.

135. Defendant's retention of the foregoing payments is inequitable under all the circumstances. Plaintiffs invested over $2,000,000 in the Deka Lash franchise system in reliance on Defendant's representations that it would deliver a functioning, supported, and protected franchise. Defendant collected fees, royalties, and fund contributions from Plaintiffs throughout the operative period of the franchise relationship while systematically failing to deliver the services, support, and infrastructure those payments were intended to fund. Weber has never paid herself a salary from either franchise entity. She was forced to sell her personal home, exhaust her personal savings, and relocate to Florida to sustain a franchise operation that Defendant's own failures rendered unable to achieve profitability. In these circumstances, it would be fundamentally inequitable to permit Defendant to retain payments made for services not rendered, amounts collected in excess of contractual entitlement, and funds extracted without authorization.

136. The total amount by which Defendant has been unjustly enriched at Plaintiffs' expense includes, at minimum, the following documented amounts:

a. Operations Onboarding and Location Assistance Fees paid for materially deficient services, totaling $5,450;

b. Non-Refundable Training Fees paid for materially deficient training, totaling $7,000;

c. Royalties improperly collected during the abatement period, totaling $2,844.27;

d. Technology fees paid during the eighteen-month digital failure period, totaling $7,581;

e. Unauthorized cross-entity ACH withdrawal, totaling $3,026.57;

f. Secret shopper fees paid for quarters in which evaluations were completed but reports were not timely delivered, the amount to be established through discovery;

g. Convention fees paid for the 2024 convention that did not occur, the amount to be established through discovery; and

h. Brand Development Fund contributions paid during the digital failure period, the amount to be established through discovery.

The aggregate of the foregoing documented amounts, exclusive of Brand Development Fund contributions and the amounts to be established through discovery, totals at minimum approximately $25,901.84. The full amount of Defendant's unjust enrichment will be established through discovery, financial records, and accounting.

137. Plaintiffs seek restitution of all amounts by which Defendant has been unjustly enriched at Plaintiffs' expense, together with pre-judgment interest on all amounts from the dates of receipt by Defendant, disgorgement of all profits Defendant derived from its retention of these funds, and such other equitable relief as the Court deems appropriate.

## COUNT VI
## VIOLATION OF THE INDIANA DECEPTIVE FRANCHISE PRACTICES ACT

138. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 137 as if fully set forth herein.

139. The Indiana Deceptive Franchise Practices Act, *Burns Ind. Code Ann.* §§ 23-2-2.7-1 through 23-2-2.7-7 (the "IDFPA"), governs the franchise relationship between Plaintiffs and Defendant. The IDFPA was enacted to protect Indiana franchisees from deceptive and unfair

practices by franchisors and to ensure that franchise agreements comport with Indiana's public policy of fair dealing in franchise relationships. The protections afforded by the IDFPA are non-waivable and cannot be abrogated by contract, including by choice-of-law or forum selection provisions. A franchisor that violates the IDFPA is liable to the franchisee for all damages proximately caused by the violation, and the court may additionally order reformation of the franchise agreement to strike any provision that violates the Act. *Burns Ind. Code Ann.* § 23-2-2.7-4.

140. The IDFPA applies to the franchise relationship between Plaintiffs and Defendant because Plaintiffs operated Deka Lash franchise locations in the State of Indiana. Defendant's conduct in connection with those Indiana franchise locations is subject to the IDFPA regardless of any choice-of-law provision in the Franchise Agreements designating Pennsylvania law, because the IDFPA's protections are non-waivable and because Indiana has the most significant relationship to this franchise relationship. Any choice-of-law or forum selection provision in the Franchise Agreements that purports to deprive Plaintiffs of their rights under the IDFPA is void and unenforceable as contrary to Indiana public policy.

141. Section 23-2-2.7-1 of the IDFPA prohibits franchisors from including certain provisions in franchise agreements, including provisions that limit litigation, require franchisees to consent to unreasonable modifications, or require advertising expenditures at indeterminate costs without corresponding obligations on the franchisor. The Franchise Agreements contain the following provisions that violate § 23-2-2.7-1:

a. The one-year contractual limitations clause, which purports to limit the period within which Plaintiffs may bring claims arising from the franchise relationship,

violates § 23-2-2.7-1's prohibition on provisions limiting litigation. This clause is void and unenforceable.

b. The Pennsylvania choice-of-law and forum selection provisions, which purport to require Plaintiffs to litigate their claims in Pennsylvania under Pennsylvania law, effectively limit Plaintiffs' ability to bring claims under the IDFPA and to litigate in the forum most convenient to them, in violation of § 23-2-2.7-1's prohibition on limiting litigation. These provisions are void as applied to Plaintiffs' Indiana franchise relationship.

c. The Brand Development Fund provisions, which authorize Defendant to collect up to three percent of gross studio sales from franchisees for advertising expenditures that are administered entirely at Defendant's discretion, without any obligation on Defendant to provide proportional benefit to contributing franchisees, impose advertising expenditure obligations at indeterminate costs and on indeterminate terms in violation of § 23-2-2.7-1.

d. The punitive damages waiver provision, which purports to require both parties to waive their rights to seek or recover punitive damages, limits Plaintiffs' litigation rights and remedies in violation of § 23-2-2.7-1's prohibition on limiting litigation.

142. Plaintiffs acknowledge that the IDFPA's two-year occurrence-based statute of limitations, applied to § 23-2-2.7-1 claims arising from provisions contained in the Franchise Agreements executed in 2021, presents a timeliness question that the Court will need to address. Plaintiffs preserve these claims and assert that the prohibited provisions are independently actionable each time Defendant invokes or enforces them—including Defendant's invocation of the one-year limitations clause in this litigation, Defendant's reliance on the Pennsylvania forum

selection clause, and Defendant's ongoing collection of Brand Development Fund contributions—each of which constitutes a new occurrence within the limitations period. To the extent any § 23-2-2.7-1 claim is found to be time-barred as applied to the original FA execution date, Plaintiffs' § 23-2-2.7-2 claims, set forth below, remain fully viable and encompass the primary conduct at issue.

143. Section 23-2-2.7-2 of the IDFPA prohibits franchisors from engaging in specified acts during the franchise relationship, including establishing competing outlets within a franchisee's exclusive territory or, where no exclusive territory is designated, competing unfairly with the franchisee within a reasonable area, coercing franchisees into accepting goods or services not required by the franchise agreement, failing to deliver agreed goods or services, and engaging in unfair discrimination among franchisees. Defendant violated § 23-2-2.7-2 through the following specific acts, each of which occurred within two years of the filing of this action:

a. Unfair Competition Within a Reasonable Area—Section 23-2.2.7-2: Because no exclusive territory is designated, the governing standard is the second clause of Section 23-2-2.7-2(4), which prohibits Defendant from competing unfairly with Plaintiffs within a reasonable area—a standard that turns on the fairness of Defendant's conduct rather than on whether a competing outlet was franchisor-owned or fell within any designated territory. Here, Defendant competed unfairly with Plaintiffs within a reasonable area. Defendant permitted a competing Deka Lash studio—the Market District studio—to open and operate approximately five miles from Plaintiffs' Carmel location from January 2023 through February 2024; permitted that studio to use "Carmel" in its name; directed Plaintiffs' own independent contractor to provide indistinguishable social media services to the competing studio; directed Plaintiffs' paid advertising and digital presence to the

competing studio while suppressing Plaintiffs' own visibility in the same channels; and failed to take any remedial action despite Weber's repeated documented complaints. This conduct lay within Defendant's exclusive control over the parties' territorial licensing, digital marketing, and advertising, and through it, Defendant itself competed unfairly with Plaintiffs within a reasonable area in violation of Section 23-2-2.7-2(4). The resulting customer confusion, market diversion, and revenue loss continued through the Market District studio's closure in February 2024 and persisted well beyond that date. To the extent the Court determines that the Protected Area constitutes an exclusive territory within the meaning of Section 23-2-2.7-2(4), Plaintiffs plead in the alternative that the same conduct constitutes unfair discrimination among franchisees and an unreasonable failure to comply with the terms of the Franchise Agreements in violation of Section 23-2-2.7-2(5), as further set forth below.

b. Coercing Acceptance of Goods and Services Not Required or Delivered, Occurring In 2024 Through 2026—Section 23-2-2.7-2 prohibits franchisors from coercing franchisees into accepting goods or services not required by the franchise agreement or from charging for goods and services not delivered. Defendant violated this prohibition through the following specific acts, all of which occurred within the two-year limitations period:

   i. Defendant charged Plaintiffs convention fees for the 2024 annual franchise convention, which did not occur, without providing any credit or refund;

   ii. Defendant charged Plaintiffs secret shopper fees throughout 2025 for evaluations that were completed but reports that were not timely delivered

to Plaintiffs, continuing to collect these fees after the secret shopper program had effectively ceased to function as represented;

iii. Defendant collected technology fees from Plaintiffs during the period of the Mindbody migration failures beginning in September 2025, during which the technology systems those fees were intended to fund were nonfunctional in critical respects, without adjustment, credit, or refund; and

iv. Defendant mandated Plaintiffs' migration to the Mindbody platform in September 2025 and required Plaintiffs to bear the operational and financial consequences of a migration that Defendant failed to support—effectively coercing Plaintiffs into accepting a technology transition that imposed costs and disruptions far beyond what the Franchise Agreements contemplated or authorized.

c. Unauthorized Financial Extractions, Occurring From 2024 Through 2026—Defendant violated § 23-2-2.7-2's prohibition on unfair and deceptive acts by extracting funds from Plaintiffs without authorization or contractual basis, including the December 2024 cross-entity ACH withdrawal of $3,026.57 from MWL Indiana LLC's Carmel account and the October 2025 unilateral imposition of daily ACH withdrawals for royalties and Brand Development Fees without notice—a change implemented without contractual authority and reversed only after Weber and other franchisees objected.

d. Failure to Deliver Agreed Goods and Services, Ongoing Through 2024—Section 23-2-2.7-2 prohibits franchisors from failing to deliver goods and services that the franchisor agreed to provide. Defendant violated this prohibition by failing to

deliver the digital marketing support, territorial protection, operational onboarding support, and training that the Franchise Agreements required, as set forth in detail in the Factual Allegations above. These failures are not merely breach of contract claims—they constitute violations of the IDFPA's affirmative prohibition on franchisors failing to deliver agreed goods and services, which carries independent statutory remedies.

e. Unfair Discrimination Among Franchisees, Occurring In October 2023 Through 2024—Section 23-2-2.7-2 prohibits franchisors from engaging in unfair discrimination among franchisees. Defendant violated this prohibition by restricting Plaintiffs' digital marketing radius to five miles in October 2023 while permitting other franchisees in the Deka Lash system to target areas of fifteen to twenty-five miles—without adequate justification, notice, or corresponding benefit to Plaintiffs. Defendant further discriminated against Plaintiffs by establishing and maintaining digital visibility for the Market District studio while simultaneously failing to establish or maintain Plaintiffs' studio in the same digital channels, and by directing Plaintiffs' paid advertising spend to benefit the Market District studio rather than Plaintiffs.

f. The January 2026 Demand, The Most Recent Violation—In January 2026, Defendant demanded repayment of the $3,026.57 that Weber reversed following Defendant's unauthorized December 2024 ACH withdrawal, and characterized Weber's reversal as a breach of the Franchise Agreement. This demand—made by a franchisor seeking to enforce the financial consequences of its own unauthorized conduct—constitutes an unfair and deceptive act in the franchise relationship

within the meaning of § 23-2-2.7-2, occurring well within the two-year limitations period.

144. Defendant will likely assert that the Franchise Agreements' choice-of-law and forum selection provisions, one-year limitations clause, and punitive damages waiver bar or limit Plaintiffs' IDFPA claims. Each of these defenses fails. The IDFPA's protections are non-waivable. A contractual provision that purports to waive, limit, or abrogate an IDFPA right is void as contrary to Indiana public policy, regardless of whether the provision was agreed to by the franchisee. The Franchise Agreements cannot contractually extinguish statutory rights that Indiana has determined cannot be waived.

145. The IDFPA's two-year occurrence-based statute of limitations applies to § 23-2-2.7-2 claims. *Gre-Ter Enterprises, Inc. v. Management Recruiters Int'l, Inc.*, 329 F. Supp. 3d 667 (S.D. Ind. 2018). Each of the § 23-2-2.7-2 violations alleged herein—the convention fee collection in 2024, the secret shopper fee collections in 2025, the Mindbody migration mandate and failures beginning September 2025, the October 2025 daily ACH imposition, the December 2024 unauthorized cross-entity withdrawal, and the January 2026 repayment demand—occurred within two years of the filing of this action and is timely. The Market District encroachment violations, which began in January 2023, are timely to the extent they continued within the two-year period preceding filing, including the customer confusion and market diversion that persisted through the Market District's closure in February 2024 and the lingering digital effects that persisted through March 2024.

146. Pursuant to *Burns Ind. Code Ann.* § 23-2-2.7-4, Plaintiffs seek reformation of the Franchise Agreements to strike the following provisions as violative of the IDFPA: the one-year contractual limitations clause; the Pennsylvania choice-of-law provision as applied to Plaintiffs'

Indiana franchise operations; the Pennsylvania forum selection clause; and the punitive damages waiver provision. Reformation of these provisions is independently warranted regardless of whether Plaintiffs ultimately prevail on their damages claims, as these provisions impose ongoing constraints on Plaintiffs' rights that the IDFPA prohibits.

**147.** As a direct and proximate result of Defendant's violations of the IDFPA, Plaintiffs have suffered damages in an amount exceeding $2,000,000, as more fully set forth in Section H above. Plaintiffs seek all remedies available under the IDFPA, including compensatory damages for all losses proximately caused by Defendant's IDFPA violations, reformation of the Franchise Agreements as set forth above, attorneys' fees and costs incurred in prosecuting this action to the extent permitted by the IDFPA and applicable law, pre-judgment and post-judgment interest on all amounts awarded, and such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Jodi Weber, JMW Indiana LLC, and MWL Indiana LLC respectfully request that this Court enter judgment in their favor and against Defendant DL Franchising, LLC d/b/a Deka Lash, and grant the following relief:

1. Award Plaintiffs compensatory damages in an amount to be determined at trial, but in no event less than $2,000,000, representing the full measure of Plaintiffs' losses proximately caused by Defendant's breach of contract, fraud, and violations of the Indiana Deceptive Franchise Practices Act, including without limitation:

a. All franchise fees, development fees, onboarding fees, and training fees paid by Plaintiffs for which Defendant failed to deliver corresponding services or benefits;

b. All royalties improperly collected during the contractual abatement period, totaling approximately $2,844.27;

c. All technology fees, Brand Development Fund contributions, secret shopper fees, and convention fees paid during periods in which the corresponding services were not provided or were nonfunctional;

d. The $3,026.57 withdrawn from MWL Indiana LLC's Carmel account without authorization in December 2024;

e. All costs Plaintiffs incurred for independent marketing necessitated by Defendant's digital marketing failures;

f. The $100,000 lease settlement paid by Weber from the proceeds of the forced sale of her personal home to secure release from the Noblesville lease;

g. All operating losses sustained by both franchise locations attributable to Defendant's conduct;

h. The value of the two undeveloped franchise territories lost as a result of Defendant's conduct, representing approximately $57,900 in development fees paid for territories Plaintiffs were unable to open; and

i. All other out-of-pocket losses and consequential damages proximately caused by Defendant's conduct, in amounts to be established through discovery and expert testimony;

2. Award Plaintiffs restitution of all amounts by which Defendant has been unjustly enriched at Plaintiffs' expense, including all fees, royalties, and fund contributions paid by Plaintiffs for services Defendant failed to deliver, in amounts to be established through discovery and accounting, together with disgorgement of all profits Defendant derived from its retention of those funds;

3. Award Plaintiffs all damages available under the Indiana Deceptive Franchise Practices Act, *Burns Ind. Code Ann.* §§ 23-2-2.7-1 through 23-2-2.7-7, for Defendant's violations of that Act, as established at trial;

4. Award Plaintiffs punitive damages against Defendant in an amount to be determined at trial on Plaintiffs' claims for fraudulent inducement (Count III) and fraud (Count IV), Defendant's conduct having been committed with malice, fraud, and conscious and deliberate disregard for Plaintiffs' rights, and the Franchise Agreements' punitive damages waiver being void, unenforceable, and subject to reformation as set forth herein;

5. Reform the Franchise Agreements dated June 29, 2021 and October 4, 2021, pursuant to *Burns Ind. Code Ann.* § 23-2-2.7-4, to strike and render void and unenforceable the following provisions as violative of the Indiana Deceptive Franchise Practices Act:

    a. The one-year contractual limitations clause purporting to limit the period within which Plaintiffs may bring claims arising from the franchise relationship;

    b. The Pennsylvania choice-of-law provision as applied to Plaintiffs' Indiana franchise operations and their rights under Indiana law;

c. The Pennsylvania forum selection clause purporting to require Plaintiffs to litigate in Pennsylvania courts; and

d. The punitive damages waiver provision purporting to require Plaintiffs to waive their right to seek punitive damages;

6. Enjoining Defendant from making any further unauthorized ACH withdrawals from Plaintiffs' accounts, including any cross-entity withdrawals from MWL Indiana LLC's accounts to satisfy obligations of any other entity; and

7. Enjoining Defendant from taking any adverse action against Plaintiffs—including characterizing Weber's December 2024 bank reversal as a breach of the Franchise Agreement or pursuing any claim against Plaintiffs arising from that reversal—pending resolution of this action;

8. Award pre-judgment interest on all amounts awarded at the maximum rate permitted by law, calculated from the dates on which each payment was made or each loss was incurred, and post-judgment interest on all amounts awarded from the date of judgment until paid in full;

9. Award Plaintiffs their reasonable attorneys' fees and costs incurred in prosecuting this action, pursuant to the Indiana Deceptive Franchise Practices Act, *Burns Ind. Code Ann.* § 23-2-2.7-4, and any other applicable provision of law or contract permitting fee-shifting in favor of a prevailing franchisee; and

10. Grant such other and further relief as this Court deems just, equitable, and proper under the circumstances.

Respectfully submitted,

**GOLDSTEIN LAW FIRM**

By: */s/ Jeffrey Goldstein*

Jeffrey Goldstein
Goldstein Law Firm, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
202.293.3947
jgoldstein@goldlawgroup.com

LEAD COUNSEL FOR PLAINTIFFS (pro hac vice admission pending)

**FUGATE GANGSTAD LOWE LLC**

By: /s/ Anne Medlin Lowe

Anne Medlin Lowe, Atty. No. 31402-49
Craig M. Fugate, Atty. No. 27550-29
Fugate Gangstad Lowe LLC
571 Monon Blvd., Ste. 200
Carmel, Indiana 46032
317.829.6797
alowe@fgllegal.com
cfugate@fgllegal.com

LOCAL COUNSEL FOR PLAINTIFFS